# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TELEBRANDS CORP., a corporation;
TV SAVINGS, LLC, a limited liability
company; AJIT KHUBANI,
individually and as president of
Telebrands Corp. and sole member
of TV Savings, LLC,

*Petitioners,*

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

No. 05-2322

On Petition for Review of an Order
of the Federal Trade Commission.
(D09313)

Argued: May 23, 2006

Decided: August 7, 2006

Before WILKINS, Chief Judge, DUNCAN, Circuit Judge, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Order enforced by published opinion. Judge Duncan wrote the opin-
ion, in which Chief Judge Wilkins and Judge Goodwin joined.

## COUNSEL

**ARGUED:** Edward Francis Glynn, Jr., VENABLE, L.L.P., Washing-
ton, D.C., for Petitioners. Leslie R. Melman, FEDERAL TRADE

COMMISSION, Washington, D.C., for Respondent. **ON BRIEF:** Theodore W. Atkinson, VENABLE, L.L.P., Washington, D.C., for Petitioners. James A. Kohm, Associate Director, Connie M. Vecellio, Bureau of Consumer Protection, Walter Gross, III, Bureau of Consumer Protection, William Blumenthal, General Counsel, John F. Daly, Deputy General Counsel for Litigation, FEDERAL TRADE COMMISSION, Washington, D.C., for Respondent.

---

**OPINION**

DUNCAN, Circuit Judge:

The petitioners, Telebrands Corporation, TV Savings, LLC and Ajit Khubani[1] (collectively, "Telebrands"), challenge the scope of a Federal Trade Commission ("FTC") Order containing an "all claims, all products" fencing-in provision. We enforce the Order.

I.

Telebrands markets a wide variety of products to consumers using direct-response advertising—product advertisements that offer the consumer a vehicle, such as a telephone number, mailing address or Internet site, to respond directly to the advertiser.[2] It routinely employs a "compare and save" strategy to select and market products. In other words, Telebrands monitors trends in the marketplace and in various advertising channels to identify popular items that it can replicate cost effectively. Once it locates such a product, Telebrands enters the market as a competitor, offering a comparable item at a lower price.

Telebrands employed this strategy when it introduced the Ab

---

[1]Khubani is the president of Telebrands Corporation and the sole member of TV Savings, LLC.

[2]Some of Telebrands's more successful products include Ambervision Sunglasses, the Magic Hanger, Dental White Tooth Whitening System, the Safety Can Opener, the Audubon Singing Bird Clock, the Better Pasta Pot and the Roll-a-Hose Flat Hose.

Force, an electronic muscle stimulation ("EMS") abdominal belt, in December 2001. The Ab Force consisted of a small battery-powered control unit held in place by an elastic belt worn around the abdominal area. The control unit cycled an electric current into the abdominal muscles, causing them repeatedly to contract and release involuntarily. When Telebrands introduced the Ab Force, several other EMS products, including several abdominal belts, were already on the market. In fact, Khubani first considered marketing an EMS abdominal belt in early 2001 when he noticed the AbTronic abdominal belt in J.W. Greensheet. J.W. Greensheet is a direct-response television industry publication that generates weekly rankings of spots and infomercials based on two sources of information: 1) media budget data that it receives from advertisers; and 2) its own monitoring of national cable and selected broadcast markets.[3]

According to J.W. Greensheet, infomercials for three competing EMS abdominal belts, AbTronic, Ab Energizer and Fast Abs, were highly ranked before and during the time that the Ab Force was being marketed. Those infomercials promoted the belts as a method to lose weight, fat and inches, and to gain well-defined abdominal muscles, all without the need for exercise. Advertisements that aired during that time period for some other EMS abdominal belts contained similar claims.

Telebrands elected not to make such claims expressly but suggested them implicitly by encouraging comparison to the products that did so. For example, Ab Force advertisements referenced "those fantastic electronic ab belt infomercials on TV." J.A. 991, 1014, 1015. The initial television and radio advertisements for the Ab Force also described abdominal belts as "the latest fitness craze to sweep the country," J.A. 991, 1015, and the radio advertisement pointed out that the other belts "promis[e] to get our abs into great shape fast—without exercise." J.A. 1015. Fit, well-muscled models were shown using the Ab Force in the television advertisements; some of those

[3]Direct-response television types include both spots (also known as short form), which are thirty seconds to two minutes in length, and infomercials (also known as long form), which are typically twenty-eight and one-half minutes in length.

models also posed to show off lean physiques, while others performed conventional abdominal exercises.

The FTC issued an administrative complaint alleging that Telebrands had made false and misleading claims in violation of sections 5 and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45, 52.[4] Specifically, the complaint alleged that Telebrands had made unsubstantiated claims that the Ab Force caused loss of weight, inches or fat, caused well-defined abdominal muscles, and was an effective alternative to regular exercise.

An administrative law judge ("ALJ") found that Telebrands had made the claims alleged in the complaint and that the claims were material to consumers. Furthermore, the parties had stipulated that Telebrands neither possessed nor relied on substantiation of the alleged claims, and that, in fact, the use of the Ab Force did not result in the claimed benefits. Therefore, the ALJ concluded that the claims made by Telebrands were false and misleading in violation of the FTC Act.

The FTC complaint sought broad "fencing-in" relief,[5] including a provision requiring Telebrands to have "substantiation prior to advertising 'any other EMS device, or any food, drug, dietary supplement, device, or any other product, service, or program.'" J.A. 717. However, the ALJ imposed a narrower provision:

> [Telebrands] . . . in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or

---

[4]Section 5 of the FTC Act makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Section 12 of the FTC Act makes "[t]he dissemination or the causing to be disseminated of any false advertisement within the provisions of [the] section . . . an unfair or deceptive act or practice in or affecting commerce within the meaning of section 5." 15 U.S.C. § 52(b).

[5]"'Fencing-in' relief refers to provisions in a final [FTC] order that are broader than the conduct that is declared unlawful. Fencing-in remedies are designed to prevent future unlawful conduct." *Telebrands Corp.*, No. 9313, 2005 FTC LEXIS 178, n.3 (F.T.C. Sept. 19, 2004).

distribution of Ab Force, any other EMS device, or any device, product, service or program promoting the efficacy of or pertaining to health, weight loss, fitness, or exercise benefits shall not make any representation, in any manner, expressly or by implication, about weight, inch, or fat loss; muscle definition; exercise benefits; or the health benefits, safety, or efficacy of any such product, service, or program, unless, at the time the representation is made, [Telebrands] possess[es] and rel[ies] upon competent and reliable scientific evidence that substantiates the representation.

J.A. 724. On appeal, the FTC affirmed the ALJ's conclusion that Telebrands had violated the FTC Act but entered a Final Order that included a broader fencing-in provision:

[Telebrands] . . . in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Ab Force, any other EMS device, *or any food, drug, dietary supplement, device, or any other product, service or program,* shall not make any representation, in any manner, expressly or by implication, about weight, inch, or fat loss, muscle definition, exercise benefits, or the health benefits, safety, performance, or efficacy of any product, service, or program, unless, at the time the representation is made, [Telebrands] possess[es] and rel[ies] upon competent and reliable evidence, which when appropriate must be competent and reliable scientific evidence, that substantiates the representation.

J.A. 773 (emphasis added).

Telebrands appeals this fencing-in provision, which it refers to as an "all claims, all products" provision and the FTC refers to as "comprehensive coverage." Telebrands requests that we modify the FTC's Final Order to replace the challenged provision with the more narrow provision imposed by the ALJ or remand to the FTC for the purpose of determining the appropriate scope of the provision in light of our opinion. Significantly, Telebrands does not appeal the FTC's conclusion that Telebrands violated sections 5 and 12 of the FTC Act.

II.

Telebrands argues that the FTC lacked authority to issue the broader fencing-in provision because no reasonable relation exists between that provision and Telebrands's violation of sections 5 and 12. Specifically, it argues that substantial evidence does not support two FTC findings relied upon as a foundation for the provision: 1) Telebrands intended to make false advertising claims; and 2) Telebrands's conduct in making implied claims in the marketing of the Ab Force is transferable to other product advertising. It also argues that the FTC erred as a matter of law in finding that Telebrands's entry into three prior consent orders for unrelated alleged violations on unrelated products, and with no admission of liability, constitutes a history of prior violations that supports the imposition of the broad fencing-in language.

Congress has "empowered and directed" the FTC to prevent the use of "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). In line with that directive, Congress has given the FTC primary responsibility for devising orders to address those deceptive practices, and the FTC has broad discretion in doing so. *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 392 (1965). The FTC's factual findings are conclusive if supported by substantial evidence. *El Moro Cigar Co. v. FTC*, 107 F.2d 429, 431-32 (4th Cir. 1939). Moreover, courts will interfere with the remedy selected by the FTC "only where there is no reasonable relation between the remedy and the violation." *Atlantic Ref. Co. v. FTC*, 381 U.S. 357, 377 (1965).

The FTC considers three factors in determining whether order coverage bears a reasonable relationship to the violation it is intended to remedy: "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations." *Stouffer Foods Corp.*, 118 F.T.C. 746, 811 (1994). In reviewing FTC orders for the existence of a reasonable relationship between the remedy and the violation, courts have relied on these same factors. *See, e.g., Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *see also, e.g., Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir.

1992); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 561 (2d Cir. 1984). We do likewise.[6]

The reasonable relationship analysis operates on a sliding scale— any one factor's importance varies depending on the extent to which the others are found. In other words, the more serious a violation, the less important transferability and prior history become. *See Sears*, 676 F.2d at 392 ("The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present."). All three factors need not be present for a reasonable relationship to exist. *See id.* We discuss each factor in turn.

## A.

We first consider the seriousness and deliberateness of the violation. Substantial evidence supports the FTC's finding that Telebrands's violations of sections 5 and 12 were serious. As noted by the FTC, Telebrands's violations did not involve overselling some aspect of a product that was essentially fit for the advertised purpose. Rather, the violations involved claiming, with no substantiation, that the Ab Force could deliver certain results that Telebrands later admitted were beyond the device's capabilities. Telebrands stipulated before the ALJ that "[t]he Ab Force does not cause loss of weight, inches or fat; [t]he Ab Force does not cause well-defined abdominal muscles; [u]se of the Ab Force is not an effective alternative to regular exercise; [and Telebrands] did not possess and rely upon substantiation for [claims that the Ab Force could deliver those benefits]." J.A. 791.

Moreover, Telebrands mounted an expensive, nationwide advertis-

---

[6]Our sister circuits have sometimes considered additional factors based on the facts of the cases before them. *See, e.g.*, *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1499 (1st Cir. 1989) (relying on FTC factors plus potential for health hazards, duration of deceptive advertisement's use, average consumer's ability to evaluate violator's claims, and extent of government regulation of advertised product); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 706 (3d Cir. 1982) (relying on FTC factors plus potential for health hazards). The parties before us do not urge the adoption of any additional factors, and the FTC factors are sufficient to determine whether a reasonable relationship exists on these facts.

ing campaign for the Ab Force that was highly successful. Telebrands spent over four million dollars on the multimedia advertising campaign for the Ab Force, which included spots that aired more than ten thousand times on cable, satellite and broadcast television outlets in major national markets. That campaign resulted in the sale of approximately 747,000 units with gross sales, including accessories, exceeding nineteen million dollars. These facts militate in favor of a finding that the violations were serious. *See Kraft*, 970 F.2d at 326 (approving FTC use of size and duration of advertising campaign as basis for seriousness finding).

Substantial evidence also supports the FTC's deliberateness finding. Telebrands's execution of the compare and save strategy, when considered in light of its extensive experience with direct-response advertising in general and with that strategy in particular, negates any suggestion that it unintentionally made the false and misleading claims found by the FTC. Telebrands employed the compare and save strategy to market the Ab Force because it wanted to capitalize on the popularity of existing EMS abdominal belts, devices that its advertisements referred to as "fantastic." It knew that the infomercials for those devices, which it referenced in its advertisements, had claimed that they caused the loss of weight, inches or fat, developed well-defined abdominal muscles, and offered an effective alternative to regular exercise. Telebrands's assertion that, because it did not explicitly make those same claims in the Ab Force advertisements, it did not intend for consumers to believe that the Ab Force provided those same benefits strains credulity. In fact, Telebrands calculatedly fostered such beliefs through its choice of visual images for the television advertisements.

Telebrands, relying on evidence that Khubani rejected a script for the Ab Force television advertisements that referred to "get[ting] into shape fast without exercise," and "hav[ing] a flatter tummy without painful sit-ups," J.A. 512, claims that it intended to make comparisons based solely on price and technology. Although this evidence suggests that Telebrands sought to avoid making explicit health claims, it fails to contradict the finding that Telebrands intended to make the same claims implicitly. Ab Force television and radio advertisements touted the device as being "just as powerful and effective" as the EMS abdominal belts sold in infomercials. J.A. 1000, 1015. Those same

advertisements lacked any explicitly identified purpose for using the Ab Force. That omission left consumers to infer, based on knowledge of the infomercials for the other EMS abdominal belts and, in the case of the television advertisements for the Ab Force, the visual images of fit models with well-defined abdominal muscles using the device, the benefit associated with the Ab Force's power and effectiveness.

Telebrands also attempts to undermine the FTC's deliberateness finding by raising tangential issues that have little or no bearing on that finding. According to Telebrands, the FTC concluded that Telebrands intended for consumers to associate the Ab Force with false claims made in the AbTronic, Ab Energizer and Fast Abs advertisements. Telebrands claims that the FTC premised that conclusion on three "linked inferences:" 1) the benefit claims made in the advertisements for those devices were, in fact, false; 2) the infomercials for those devices were among the most frequently aired during the time period immediately before and during the Ab Force marketing campaign; and 3) the existence of other EMS products on the market at the time of the Ab Force marketing campaign was irrelevant. It then challenges the validity of each inference. Telebrands's focus on these tangential issues appears to be nothing more than an indirect attack on the FTC's conclusion that Telebrands violated sections 5 and 12 of the FTC Act, a conclusion that Telebrands did not appeal. Nevertheless, we briefly address each of Telebrands's arguments.

Telebrands argues that the FTC's failure to introduce evidence that the weight loss and exercise claims made in the Ab Energizer, AbTronic and Fast Abs advertisements were false precludes the conclusion that references to those advertisements demonstrated Telebrands's intent to make false claims. We disagree. The issue is whether Telebrands intended to make false and misleading claims. Substantial evidence supports the fact that it intended to insinuate that the Ab Force could deliver the same weight loss and exercise benefits claimed in the advertisements for the other EMS abdominal belts. Even if the AbTronic, Ab Energizer and Fast Abs could deliver those benefits, the claims would be false as applied to the Ab Force because Telebrands stipulated that "[t]he Ab Force does not cause loss of weight, inches or fat; [t]he Ab Force does not cause well-defined abdominal muscles; [u]se of the Ab Force is not an effective alternative to regular exercise; [and Telebrands] did not possess and rely

upon substantiation for [claims that the Ab Force could deliver those benefits]." JA 791.

Telebrands challenges the validity of the second and third inferences, arguing that it did not intend to refer to the AbTronic, Ab Energizer and Fast Abs, and thus, to the benefit claims made in the infomercials for those devices, when it referenced "those fantastic electronic ab belt infomercials on TV." It argues that the FTC's finding that the AbTronic, Ab Energizer and Fast Abs infomercials were among the most frequently aired on television lacks support in the record, and that the FTC gave insufficient weight to the fact that other EMS products were being marketed during the same time period as those devices. Whether the AbTronic, Ab Energizer and Fast Abs infomercials were the *most* frequently aired on television is irrelevant. Khubani admitted that Telebrands used J.W. Greensheet to get a general idea of what was on television, even though he did not necessarily believe the absolute order of the rankings was reliable. That publication highly ranked the infomercials for the AbTronic, Ab Energizer and Fast Abs. Moreover, Khubani admitted that seeing the AbTronic in the publication's rankings influenced Telebrands's decision to market the Ab Force. To be effective, the compare and save strategy requires a point of reference with which the consumer is familiar. This evidence suggests that Telebrands believed that the AbTronic, Ab Energizer and Fast Abs infomercials aired frequently enough to provide that familiarity. The fact that other EMS products were being marketed during that same time period fails to advance Telebrands's claim that its violations were not deliberate, especially given the fact that at least some, if not all, of the advertisements for other EMS abdominal belts made health claims similar to those made in the AbTronic, Ab Energizer and Fast Abs infomercials.

B.

We next consider the second factor relevant to the existence of a reasonable relationship between the remedy and the violation, the transferability of Telebrands's conduct to other products. Substantial evidence supports the FTC's finding that Telebrands's conduct is transferable. The FTC found that the marketing strategy for the Ab Force has potential applicability to almost any kind of product or service, including many that Telebrands already markets. Indeed, the

compare and save strategy is one of Telebrands's standard marketing tools. An unfair practice is transferable when other products can be marketed using similar techniques. *See Sears*, 676 F.2d at 392, 394-95.

Telebrands argues that the FTC's factual findings are insufficient to justify the Order's broad fencing-in language because those findings relied upon a peculiar fact pattern surrounding the marketing of the Ab Force that is unlikely to be repeated. Specifically, it contends that the circumstances were unique because it marketed the Ab Force at the same time as three competing products that 1) were substantially similar in appearance, 2) were advertised on frequently aired infomercials using similar visual images of attractive men and women, and 3) made claims that were subsequently the subject of FTC enforcement action.[7]

Again, Telebrands attempts to shift the focus of our analysis to minutiae. The circumstances that enabled Telebrands to mount such an effective marketing effort for the Ab Force are immaterial to our analysis of transferability, except in as much as they reflect on Telebrands's ability to recognize and use such circumstances to its advantage in making false and misleading claims. The pertinent issue with respect to transferability is whether Telebrands's conduct—evoking explicit benefit claims made in the advertisements for other products and using visual images to imply, without substantiation, that the Telebrands product will produce those same benefits—can be used by Telebrands to sell other goods and services. The record amply supports the FTC's conclusion that it can.

Khubani acknowledged that one of Telebrands's modes of operation involves targeting existing products that it can imitate profitably.

---

[7]The FTC filed actions seeking permanent injunctive and equitable monetary relief against the marketers of the Ab Energizer, AbTronic and Fast Abs, "alleging that their advertisements made false representations that the devices were an effective alternative to exercise and caused users to lose weight, inches, and fat." J.A. 732. It settled separately with the marketers of the Ab Energizer and Fast Abs for permanent injunctions and equitable monetary relief. It was awarded a permanent injunction and a judgment of monetary relief in the AbTronic case.

Indeed, this approach is one reason that Telebrands incurs the expense of subscribing to publications that monitor direct-response advertising. In implementing the compare and save strategy for the Ab Force, Telebrands deliberately selected a popular product category with frequently advertised comparative products. The product category became popular due, at least in part, to the claims that were subsequently the subject of FTC enforcement action. Frequent advertising of the comparative products created consumer familiarity, an element essential to the compare and save strategy. Because the other devices were already on the market, Telebrands controlled the degree of similarity between the Ab Force and the other EMS devices and between the visual images used in the Ab Force campaign and those used for advertising the other devices. Thus, the fact pattern surrounding the marketing of the Ab Force does not represent a unique set of circumstances that is unlikely to be repeated; it represents a concerted effort by Telebrands to recognize, create and use circumstances to competitive advantage. Only Telebrands's imagination and budget would limit its ability to use similar tactics in the future.

Telebrands also argues that the FTC's Order attempts to fence-in a legal practice, the compare and save strategy, "on the theory that the practice could be used deceptively at some point in the future." Appellant's Br. at 53. This argument is simply inaccurate. The FTC Order does not prohibit Telebrands from employing a compare and save strategy. It only places off-limits Telebrands's use of the compare and save strategy, or any other strategy, to make representations about its products without competent and reliable evidence to substantiate those representations. In other words, the Order only prohibits the use of the compare and save strategy in a manner that violates the FTC Act.

## C.

Finally, Telebrands challenges the FTC's application of the third factor in determining whether a reasonable relationship exists between the remedy and the violation, the existence of any history of prior violations. Telebrands argues that the FTC erred as a matter of law in finding that Telebrands's entry into three prior consent orders for unrelated alleged violations on unrelated products, and with no

admission of liability, supports the imposition of the broad fencing-in language.

The FTC concluded that the first "two factors—the serious and deliberate nature of [Telebrands's] violations and the ease with which they can be transferred to any one of the myriad of services and products offered by [Telebrands]—are sufficient, without more, to justify comprehensive coverage in [the] final order." J.A. 765. Nevertheless, it proceeded to conclude that Telebrands's history of entering into multiple prior consent orders with the FTC supported such coverage.

We agree with the FTC's conclusion that the extent of the first two factors establishes that a reasonable relationship exists between the remedy and the violation. *See Kraft*, 970 F.2d at 327 (holding that seriousness, deliberateness and transferability of violations were sufficient to establish reasonable relationship between remedy and violation despite no history of prior violations). Accordingly, we need not reach the issue of whether the FTC erred as a matter of law in considering the consent orders.

### III.

For the foregoing reasons, we deny Telebrands's petition to modify the FTC's Final Order. The Order is

*ENFORCED*.