# United States Court of Appeals
## For the First Circuit

No. 15-1520

JOHN FANNING,

Petitioner,

v.

FEDERAL TRADE COMMISSION,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE FEDERAL TRADE COMMISSION

Before

Torruella, Lynch, and Barron,
<u>Circuit Judges</u>.

<u>Peter F. Carr, II</u>, with whom <u>Pamela C. Rutkowski</u> and <u>Eckert Seamans Cherin & Mellott, LLC</u>, were on brief, for petitioner.
<u>Bradley Grossman</u>, Attorney, Federal Trade Commission, with whom <u>Jonathan E. Nuechterlein</u>, General Counsel, <u>Joel Marcus</u>, Director of Litigation, <u>Leslie Rice Melman</u>, Assistant General Counsel for Litigation, <u>Sarah Schroeder</u> and <u>Boris Yankilovich</u>, Attorneys, were on brief, for respondent.

May 9, 2016

**TORRUELLA**, **Circuit Judge**.  Defendant-Appellant John Fanning petitions this court for review of the Federal Trade Commission's ("the Commission") summary decision finding him personally liable for misrepresentations contained on the website Jerk.com in violation of the Federal Trade Commission Act ("FTC Act").  We agree with the Commission's findings that Jerk.com materially misrepresented the source of its content and its membership benefits.  Nonetheless, we agree with Fanning that portions of the Commission's remedial order are overbroad.  We affirm the finding of liability and the remedial order recordkeeping provisions and order acknowledgment requirement.  Because we conclude the remedial order's compliance monitoring provisions as to Fanning are overbroad, we vacate that portion of the Commission's order and remand for proceedings consistent with this opinion.

### I.  Background[1]

In 2009, Fanning founded Jerk LLC ("Jerk") and Jerk.com.[2] From 2009 to 2014, Jerk operated Jerk.com.[3]

---

[1]  Unless otherwise noted, the facts in this case are undisputed.

[2]  Jerk also operated Jerk.be and Jerk.org.  For simplicity, we refer to these websites collectively as Jerk.com.

[3]  Jerk.com ceased operation in 2014.

Jerk.com was a self-proclaimed reputation management website. Its homepage greeted users by asking them if they were "[l]ooking for the latest scoop on a world filled with jerks" and stated that "millions" of people "use[d] Jerk for important updates, business, dating, and more." The homepage listed several benefits Jerk.com offered, including tracking one's own and other people's reputations, "enter[ing] comments and reviews for [other] people," "[h]elp[ing] others avoid the wrong people," and "prais[ing] those who help you."

Jerk.com's main feature was its profile pages. Each page corresponded with a particular individual and displayed that person's name. The profiles allowed users to vote on whether someone was a "Jerk" or "not a Jerk" and displayed the total number of "Jerk" and "not a Jerk" votes received. Jerk.com users could also post anonymous reviews about a person, which were visible on that person's profile page. By 2010, Jerk.com contained 85 million profiles pages. Very few of these profile pages had reviews posted and those reviews that were posted were largely derogatory.

Jerk.com also had a "Remove Me!" page, which stated that individuals could "manage [their] reputation and resolve disputes" regarding content on their profile pages through a paid subscription. The "Remove Me!" page contained a link to a separate

subscription page where users could enter their billing and credit card information to purchase a $30 membership. The subscription page reiterated that only paid members could "create a dispute" about the content of a profile.

Despite its large number of profile pages, Jerk.com had relatively few users. Jerk.com had a "Post a Jerk" page that allowed users to create a profile for themselves or others by entering a person's first and last name, e-mail address, university affiliation, and location. But Jerk created the vast majority of profiles by using a computer program that populated profile pages with names, photos, and other content obtained from searching Facebook -- a fact Jerk.com did not disclose on any of its pages.

In April 2014, the Federal Trade Commission's enforcement arm ("FTC") filed a two-count administrative complaint charging Jerk and Fanning with engaging in "deceptive acts or practices in or affecting commerce" in violation of section 5(a) of the FTC Act. 15 U.S.C. § 45(a)(2). The first count alleged that Jerk.com misrepresented the source of its content by claiming that it was entirely user generated. The second count alleged that Jerk.com misrepresented the benefits of purchasing a $30 membership.

The FTC moved for summary decision (the administrative equivalent of summary judgment) on both counts in September 2014.

The Commission granted the motion on both counts and found Fanning personally liable[4] for Jerk's misrepresentations. The Commission also issued an order enjoining Jerk and Fanning from making certain misrepresentations and imposing monitoring and recordkeeping requirements. Fanning (but not Jerk) filed this timely petition.

## II. **Liability**

The FTC Rules of Practice and Procedure allow the Commission to grant "summary decision," which is reviewed under the same standard as summary judgment before a district court. See 16 C.F.R. § 3.24(a)(2); P.R. Aqueduct & Sewer Auth. v. EPA, 35 F.3d 600, 607 (1st Cir. 1994). Under the summary judgment standard, we "draw all reasonable inference in favor of the non-moving party," but disregard "conclusory allegations, improbable inferences, and unsupported speculation." Méndez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011) (quoting Del Toro Pacheco v. Pereira, 633 F.3d 57, 62 (1st Cir. 2011)). This court then asks whether a reasonable decision maker could conclude there was

---

[4] Fanning makes some statements in his brief proclaiming that he was merely an advisor to Jerk. In no part of his brief, however, does Fanning state that he is petitioning for review of the Commission's finding of personal liability, nor does he develop any arguments about why the Commission's finding was wrong. We therefore view this argument as waived. See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (finding waived claims that are "adverted to in a cursory fashion, unaccompanied by developed argument").

no "genuine issue of material fact" that "may affect the outcome of the case." P.R. Aqueduct, 35 F.3d at 605. Nonetheless, judicial review of FTC findings is deferential. See Kraft, Inc. v. FTC, 970 F.2d 311, 316 (7th Cir. 1992). Although "the words 'deceptive practices' set forth a legal standard" and "must get their final meaning from judicial construction," "the Commission is often in a better position than are courts to determine when a practice is 'deceptive'" and "the Commission's judgment is to be given great weight by reviewing courts." FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385 (1965).

In determining whether a defendant has engaged in deceptive acts or practices, the Commission uses a three-part test considering (1) "what claims are conveyed;" (2) "whether those claims are false, misleading, or unsubstantiated;" and (3) "whether the claims are material to prospective consumers." POM Wonderful, LLC v. FTC, 777 F.3d 478, 490 (D.C. Cir. 2015); see also Kraft, 970 F.2d at 314; Novartis Corp., 127 F.T.C. 580, 679 (1999). As explained below, Jerk.com contained false and material statements about the source of its content and the benefits of a paid membership such that the Commission's grant of summary decision was proper.

**A.  Count I**

Under Count I, the FTC alleged that Jerk.com contained material misrepresentations that its content was user generated. We agree.

### 1.  The Misrepresentation

Fanning does not dispute that if Jerk.com claimed all of its profile pages were user generated, that claim would be false. Rather, he argues that Jerk.com made no such claim.  In determining whether a claim has been made, the Commission looks at the "overall net impression," POM Wonderful, 777 F.3d at 490 (quoting Kraft, 970 F.2d at 314), left with "consumers acting reasonably under the circumstances," id. (quoting Thompson Med. Co., 104 F.T.C. 648, 788 (1984)).

"Claims can either be express or implied."  Novartis, 127 F.T.C. at 680.  "[I]mplied claims fall on a continuum, ranging from the obvious to the barely discernable."  Kraft, 970 F.2d at 319; see also Novartis, 127 F.T.C. at 680; Thompson Med. Co., 104 F.T.C. at 788-89.  Although the Commission may look at extrinsic evidence of consumer perceptions to guide its interpretation, this is not required.  Kraft, 970 F.2d at 319-20. "When confronted with claims that are implied, yet conspicuous, . . . common sense and administrative experience provide the Commission with adequate tools to make its findings."  Id. at 320.

Moreover, the Commission need not find that all, or even a majority, of consumers found a claim implied. The Commission has previously stated that if "a[] [claim] conveys more than one meaning, only one of which is misleading, a seller is liable for the misleading interpretation even if nonmisleading interpretations are possible." Telebrands Corp., 140 F.T.C. 278, 291 (2005), aff'd, 457 F.3d 354 (4th Cir. 2006). Liability may be imposed if "at least a significant minority of reasonable consumers [would be] likely to take away the misleading claim." Id.

Starting with Jerk.com's content, the Commission viewed Jerk.com's references to its "millions" of users; its disclaimers that it could not be held liable for content because its content reflected the views of its users; and the "Post a Jerk" page inviting users to create profile pages as creating a "net impression" that implied Jerk.com contained wholly user generated content.[5] Based on its logical interpretation of Jerk.com's

---

[5] Fanning also argues that the Commission violated his due process rights by finding an implied misrepresentation when the FTC's motion for summary decision focused primarily on an express misrepresentation theory. As Fanning conceded at oral argument, the FTC's complaint and motion for summary decision contained references to both implied and express misrepresentations. We therefore find no merit in his claim that he lacked notice that the Commission could impose liability based on an implied misrepresentation theory.

content, we see no basis for setting aside the Commission's conclusion that at least a significant minority of users could reasonably view Jerk.com as claiming its content was wholly user generated.

Fanning's main argument is that the statements on Jerk.com's "About Us" page that the Commission relied upon were "part of standard terms and conditions of use" such that "[n]o reasonable consumer . . . could possibly have been misled to believe that all content [on Jerk.com] was created by individual 'users.'" Jerk.com's "About Us" page was divided into twelve sections, three of which stated that users were responsible for the content they posted.[6] Subsection 2 of that page, "Online Conduct," restricted what users could post on profiles pages and stated that Jerk.com users agreed to be "solely responsible for the content or information [they] publish[ed] or display[ed]." Subsection 4, "Online Content," stated "[o]pinions, advice, statements, offers or other information or content" on Jerk.com were "those of their respective authors and not of Jerk LLC." Subsection 5, "Removal of Information," told users they were

---

[6] The other nine sections discussed limitations on Jerk's liability ("Indemnity," "Disclaimer of Warranty," and "Limitation of Liability"), privacy policy ("Information Supplied by You"), and general legal terms ("Proprietary Rights," "Membership Terms & Conditions," "State by State Variations," "General Provisions," and "Copyright Policy").

"solely responsible for the content of [their] postings on jerk.com."

Fanning is correct that the disclaimers on the "About Us" page would be insufficient to support an implied misrepresentation claim standing on their own. But the Commission did not view these statements in isolation -- rather, it looked at statements made throughout Jerk.com and noted that the statements on the "About Us" page contributed to an overall net impression that all content was user generated. Even if the "About Us" page generally consisted of legal disclaimers, the Commission focused its analysis on Jerk.com's homepage and "Post a Jerk" pages. The Commission viewed Jerk.com's homepage, referencing its "millions" of existing users, as "introduc[ing] the website as a vibrant source of user participation and social interaction." The Commission also noted that the benefits Jerk.com advertised on its homepage -- "[e]nter[ing] comments and reviews for people you interact with," "[h]elp[ing] others avoid the wrong people," and "[p]rais[ing] those who help you" -- all "convey[ed] the essential message that Jerk.com is based on content generated by its users." This message, the Commission continued, was "further underscored by the 'Post a Jerk' feature which invited consumers to post profiles of other individuals to the site." Only after noting these features did the Commission cite the statements on Jerk.com's

"About Us" page as also enforcing the impression Jerk.com's content was user generated.

As the Commission concluded, these pages all "sp[oke] in terms of user-posted content." Moreover, even if Jerk.com never expressly represented that its profile pages were created exclusively by users, it never expressly stated how the pages were created. The only information regarding the origin of the profile pages was the "Post a Jerk" page allowing users to create profiles for other people.[7] Given Jerk.com's emphasis on user-generated content and the lack of information to the contrary, reasonable consumers could conclude other Jerk.com users created their profile pages.

---

[7] Fanning briefly suggests that Jerk.com disclosed the source of its content in the "Remove Me" page. That page stated "No one's profile is ever removed because Jerk is based on searching free open internet searching databases and it's not possible to remove things from the Internet." Disclaimers, however, can mitigate false statements only if "they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 12 (1st Cir. 2010) (quoting Removatron, 884 F.2d at 1497). As discussed above, Jerk.com contained several statements on its homepage and "About Us" page (those pages that described Jerk.com for users) stating its content was user generated. The single statement on a separate page is not prominent enough to counteract these statements. Thus, we agree with the Commission that the ambiguous language on the "Remove Me" page did little to dispel the net impression that Jerk.com's content was entirely user generated.

The Commission's interpretation is further bolstered by extrinsic evidence.[8] Consumers complained to the FTC about Jerk.com and in many of these complaints, consumers stated concern that someone they knew created their profile page. The Commission need only rely on "its own reasoned analysis" in determining whether a claim has been made, Kraft 970 F.2d at 319, but this additional evidence is further proof that reasonable consumers believed Jerk.com claimed its content was user generated. In light of this record, we see no genuine issue of material fact as to whether Jerk.com contained an implied misrepresentation about the source of its content.

**2. Materiality**

The FTC Act imposes liability for misrepresentations only if they are material. See POM Wonderful, 777 F.3d at 490. "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.'" Kraft, 970 F.2d at 322 (quoting Cliffdale Assocs., 103 F.T.C. 110, 165 (1984)). The Commission presumes materiality with at least four types of claims: (1) express claims; (2) intended implied claims; (3) claims

---

[8] Based on the adequacy of the record to support the other findings made, we do not analyze the contention that Jerk and Fanning fully intended to convey at least implicitly that profiles were user generated.

involving health or safety; and (4) claims pertaining to a central characteristic of the product about "which reasonable consumers would be concerned."  Id.; see Cliffdale Assocs., 103 F.T.C. 110 (1984) (noting that "information pertaining to the central characteristic of the product or service will be presumed material").

Fanning argues that the Commission relied upon "advertising cases" in which "consumers made product purchasing decisions in reliance upon purported implied representations within the advertisements at issue," and that nothing on Jerk.com could be construed as an advertisement.  There is no requirement that a misrepresentation be contained in an advertisement.  The FTC Act prohibits "deceptive acts or practices," 15 U.S.C. § 45(a)(2) (emphasis added), and we have upheld the Commission when it imposed liability based on misstatements not contained in advertisements, see, e.g., Sunshine Art Studios, Inc. v. FTC, 481 F.2d 1171, 1173-74 (1st Cir. 1973) (finding FTC Act violation based on company's practice of sending customers excess merchandise and using "a fictitious collection agency to coerce payment").  We see no reason why it would not be a deceptive act or practice to place misrepresentations on websites if those misrepresentations "affect[ed] [consumers'] choice of, or conduct" regarding the website.  Kraft, 970 F.2d at 322.

On this point, Fanning does not provide us with any arguments as to why the Commission concluded incorrectly that consumers altered their behavior based on Jerk.com's misrepresentation that its content was user generated. The Commission concluded that a presumption of materiality applied because Jerk.com misrepresented one of its central characteristics. We see no logical gap in the Commission's view that the source of profile pages goes to a central characteristic of a social networking website. A consumer's belief that Jerk.com had many users or that an acquaintance made his or her profile page would influence that consumer's decision to use Jerk.com or purchase a membership. The Commission also cited evidence that some consumers, in fact, purchased memberships from Jerk.com based on concerns that someone they knew created their profile pages and it would be seen by others. We thus conclude summary decision was proper on Count I.

## B. Count II

We also agree with the Commission that Jerk.com contained material and false statements about the benefits of its $30 paid membership. Jerk.com's "Remove Me" and "billing information" pages stated that a $30 paid membership would allow users to "manage [their] reputation and "create a dispute" about the content of a profile page. As the Commission found, Jerk.com

-14-

expressly represented that a $30 membership would allow users to contest and potentially remove negative reviews on their profile pages.

Fanning has failed to create a genuine dispute about the falsity of this claim. Two FTC investigators paid the $30 membership fee and never received any communication from Jerk. The FTC received numerous complaints stating the same. Fanning adduces no evidence showing Jerk.com provided services to (or even communicated with) users who paid the membership fee. He argues only that there was a factual dispute about whether Jerk or Fanning engaged in a "pattern [or] practice . . . to take money from consumers without providing benefits as promised." Fanning, however, fails to cite any evidence to the contrary -- the record is bereft of any evidence that Jerk.com provided even one paid member the opportunity to contest information on a profile page. There is no evidence suggesting the people who paid but received no benefits were an aberration or mistake. "[C]onclusory allegations . . . are insufficient to defeat summary judgment" and Fanning has failed to provide more than that. Margarian v. Hawkins, 321 F.3d 235, 240 (1st Cir. 2003) (quotation mark omitted).

We also conclude Jerk.com's misrepresentation was material. As the Commission found, this misstatement triggers two

separate presumptions of materiality -- it was both express and about a central characteristic of the $30 membership. See Kraft, 970 F.2d at 322. The Commission also found ample evidence that the misrepresentation affected consumer behavior, as reflected in the numerous complaints from consumers stating they paid the membership fee so that they could have their profiles (or reviews contained therein) removed. We find summary decision proper on Count II as well.

### III.  **The FTC's Order**

Even if the Commission properly held him liable, Fanning argues that the Commission's injunctive order against him is overbroad on both statutory and First Amendment grounds. In Part I of its order, the Commission enjoins Jerk and Fanning from misrepresenting the "source of any content on a website" and "the benefits of joining any service." Fanning argues that this provision abridges his First Amendment right to free speech. In addition, the Commission subjects Fanning to several monitoring and reporting provisions, which Fanning challenges as overbroad.

The Commission may enter a cease and desist order if it finds that a method of competition or practice violates other parts of the FTC Act. 15 U.S.C. § 45(b). The Supreme Court has interpreted the FTC Act as giving the Commission "wide discretion in determining the type of order that is necessary to cope with

-16-

the unfair practices found." Colgate-Palmolive, 380 U.S. at 391. Thus, the Commission may "frame its order broadly enough to prevent respondents from engaging in similarly illegal practices" in the future. Id. at 395. The Court has similarly held that "the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned . . . it must be allowed effectively to close all roads to the prohibited goal." FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952).

## A. Injunction on Misleading Speech

We find no merit to Fanning's objections to the Commission's order enjoining him from making any misrepresentations about the "source of any content on a website" and "the benefits of joining any service." Fanning's only objection to this provision is on First Amendment grounds. The First Amendment, however, does not protect misleading commercial speech. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 563 (1980); see also Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 8 (1st Cir. 2007) ("[A]dvertising that is actually misleading 'may be prohibited entirely.'" (quoting In re R.M.J., 455 U.S. 191, 203 (1982))).

Fanning counters that the Commission erred by categorizing the content of Jerk.com as commercial speech because

-17-

it "did not solely involve economic interests."  Even if Jerk.com did not contain only commercial speech, the Commission's order explicitly states Fanning may not engage in two types of misrepresentations "in connection with the marketing, promoting, or offering for sale of any good or service."  This language unambiguously limits the order's reach to commercial speech.

In the alternative, Fanning argues that commercial speech is still subject to First Amendment protection.  Although that statement is true, as we previously noted, the First Amendment does not protect misleading commercial speech.  Contrary to Fanning's assertions, the Commission's order reaches only misrepresentations.  We recognize that the First Amendment requires the Commission's order to have a "'reasonable fit' between the restriction and the government interest it serves," but that requirement has been satisfied.  Id. at 117 (quoting Bd. Of Trs. v. Fox, 492 U.S. 469, 480 (1989)).  The Commission limited its injunction to misrepresenting a website's source of content and the benefits of joining a service, the two violations related to its findings regarding Jerk.com.  We therefore uphold Part I of the Commission's order.

## B.  Monitoring Provisions

More problematic, however, are the order's monitoring provisions.  We may interfere with a Commission order if "the

-18-

remedy selected bears no reasonable relation to the unlawful practices found to exist," Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1499 (1st Cir. 1989) (quoting FTC v. Nat'l Lead Co., 352 U.S. 419, 428 (1957)), or "the order's prohibitions are not sufficiently 'clear and precise in order that they may be understood by those against whom they are directed,'" id. (quoting Colgate-Palmolive, 380 U.S. at 392). On this former reasonableness prong, we have found seven factors as instructive in guiding our analysis:

> (1) the deliberateness of the violation; (2) the violator's past record . . . ; (3) the adaptability or transferability of the unfair practice to other products; (4) the seriousness of potential violations, including health hazards; (5) the length of time the deceptive ad [or practice] has been used; (6) the difficulty for the average consumer to evaluate such claims through personal experience; and (7) whether the pervasive nature of government regulation of the product at issue is likely to create a climate in which questionable claims have all the more power to mislead.

Id. (quotations marks and citations omitted). We evaluate these factors using a "sliding scale" approach. Telebrands Corp., 457 F.3d at 358-59. "[N]o single factor [is] determinative" and the "more egregious the facts with respect to a particular element, the less important it is that another negative factor be present." Removatron, 884 F.2d at 1499 (second alteration in original) (quoting Sterling Drug, Inc. v. FTC, 741 F.2d 1146, 1155 (9th Cir. 1984)).

-19-

Parts III, IV, and VI of the Commission's order contained various monitoring provisions and Fanning challenges them all. We address their validity in turn.

### 1. Recordkeeping Provisions

Part III of the FTC order contains two monitoring provisions for which Fanning now seeks review. First, Fanning challenges the provision requiring him to "maintain" and "make available" "advertisements and promotional materials containing any representation covered by [the] order" for a period of five years. Fanning argues that compliance with this provision is "unmanageable" and "nonsensical" because Jerk.com did not contain any advertisements or promotional material. Second, Fanning argues that the Commission's requirement that he notify it of any "[c]omplaints or inquiries relating to any website or other online service" for a period of five years are overly punitive in light of the Commission's finding of an implied misrepresentation.

We conclude these recordkeeping provisions are reasonably related to Fanning's FTC Act violations. They ensure the Commission will know about Fanning's other business ventures, how Fanning portrays them to the public, and how the public perceives them. These requirements are also tied to the subject matter of Fanning's violation -- misrepresenting the source of Jerk.com's content and the benefit of its membership subscription.

Under the Commission's order, Fanning need only maintain advertisements and promotional material containing representations about the content on a website or the benefits of joining a service. These monitoring provisions seem particularly reasonable based on "the adaptability or transferability of the unfair practice to other products." Removatron, 884 F.2d at 1499. As the Commission noted, Jerk.com appeared under different domain names. Fanning also started a similar website called "Reper" while running Jerk.com. The ease with which Jerk.com's practices could be transferred to other websites weighs in favor of requiring Fanning to comply with some reporting requirements.

Moreover, we reject Fanning's contention that the complaint monitoring provision must be invalidated because it is disproportionate to an implied misrepresentation claim. Although Jerk.com contained only an implied misrepresentation of the source of its content, it expressly misrepresented the benefits of paying for a membership subscription. The deliberateness of Jerk.com's express representation that it provided membership services also favors allowing the Commission to engage in tailored monitoring.

## 2. Order Acknowledgment & Compliance Monitoring

Finding the Commission's recordkeeping provisions reasonable, we turn our attention to the broader reporting requirements. Part IV of the order requires Fanning to give "a

-21-

copy of [the Commission's] order to all current and future principals, officers, directors, and managers, and to all current and future employees, agents, and representative having responsibilities with respect to the subject matter of [the] order, and shall secure from each such person a signed and dated statement acknowledged receipt" for a period of twenty years. Fanning argues this provision is "overly-broad" and does not serve a legitimate government interest. Part VI of the order, "compliance monitoring," requires Fanning to "notify the Commission of . . . his affiliation with any new business or employment," and submit information including the new business's "address and telephone number and a description of the nature of the business" for a period of ten years. Fanning argues that requiring him to report all "affiliation[s]" with any business venture is both overly vague and onerous. He also argues that this reporting lacks a reasonable relation to his violation.

Although we uphold the order acknowledgment provisions, we conclude the compliance monitoring provisions are not reasonably related to Fanning's violation. In response to Fanning's argument that the order acknowledgment provisions are overly broad, the Commission notes that Fanning need only notify individuals who have responsibilities related to the subject matter of its order. As with the recordkeeping provisions, we

-22-

view the transferability of Jerk.com's deceptive practices and the deliberateness of Fanning's violations as key. Distribution of the order to individuals with related responsibilities puts them on notice of the prohibited conduct and thus makes it more difficult for Fanning to receive assistance in replicating Jerk.com's deceptive practices. Rather than serving no legitimate government interest, as Fanning claims, the order acknowledgment provisions are permissible fencing-in provisions that help "close all roads to the prohibited goal." Ruberoid, 343 U.S. at 473.

In contrast, Fanning's compliance monitoring provisions do not contain a similar restriction. Fanning must notify the Commission of all business affiliations and employment -- regardless of whether or not the affiliate or employer has responsibilities relating to the order. Notably, the compliance monitoring provisions applicable to Jerk require it to report only those changes in its structure "that may affect compliance obligations arising under this order." Both the order acknowledgment and Jerk's compliance monitoring provisions are tied to Jerk.com's FTC Act violations. Fanning's compliance monitoring provisions are the only parts of the order not containing such a requirement of relevance. When asked at oral argument, the Commission conceded that this provision would ostensibly require Fanning to report if he was a waiter at a

restaurant.  The only explanation offered by the Commission for this breadth is that it has traditionally required such reporting. The Commission cites several district courts approving proposed orders by the FTC containing similar provisions.  The orders, however, are not only less onerous[9] than the one imposed on Fanning, but also almost entirely bereft of analysis that might explain the rationale for such a requirement.[10]  Without any

---

[9]  The Commission cites several orders that require individuals to report any change of business and that business's contact information for twenty years.  See FTC v. HES Merchant Servs. Co., No. 6:12-cv-1618, 2015 WL 892394, at *8 (M.D. Fla. Feb. 11, 2015) (requiring defendant to report change in title or role and identify name, physical address, and any Internet address of the business for twenty years); FTC v. Wellness Support Network, Inc., No. 10-cv-4879, 2014 WL 644749, at *20-22 (N.D. Cal. Feb. 19, 2014) (same); FTC v. Ivy Capital, Inc., No. 2:11-cv-283, ECF No. 409, at 17 (D. Nev. July 5, 2013), aff'd in part and vacated and remanded in part on unrelated grounds, 616 F. App'x 360 (9th Cir. 2015) (same); FTC v. John Beck Amazing Profits LLC, No 2:09-cv-4719, ECF No. 643, at 27-28 (C.D. Cal. Aug. 21, 2012) (same); FTC v. Navestad, No. 09-cv-6329, 2012 WL 1014818, at *11 (W.D.N.Y. Mar. 23, 2012) (same).  Those orders that do require individuals to also provide descriptions of their employers and business last only for three to five years.  See FTC v. Neovi, No. 3:06-cv-1952, ECF No. 118, at 10 (S.D. Cal. Jan. 7, 2009) (requiring defendant to report change in employment with name, address, and description of business for five years); FTC v. Pac. First Benefit, 472 F. Supp. 2d 981, 988 (N.D. Ill. 2007) (requiring defendant to report name, address, and description of employment or business for five years); FTC v. Gill, 71 F. Supp. 2d 1030, 1051 (C.D. Cal. 1999) (requiring defendant to report name, address, and description of employment or business for three years).

[10]  Of the cited cases, only FTC v. Wellness Support Network, Inc. contains an explanation for the compliance reporting requirements. The defendants in that case made misleading representations about diabetes products over the course of eight years.  Wellness Support, 2014 WL 644749, at *2.  The district court concluded that

guidance from the Commission, we cannot find these provisions are reasonably related to Fanning's violation. As a result, we conclude the Commission's order, in this respect, must be vacated and remanded.

## IV.  Conclusion

We affirm the Commission's entry of summary decision as to liability and all provisions of its remedial order except for compliance monitoring as to Fanning. As to that, we vacate and remand that portion of its order for proceedings consistent with this opinion. The parties shall bear their own costs.

**Vacated and Remanded**.

---

lengthy monitoring was necessary because the defendants had been "personally involved in serious violations of the FTC Act over a period of many years." Id. at *22. The district court simply states that the Commission must know the defendant's business affiliation "in order. . . to monitor Defendants' compliance." Id. We do not find this bare analysis persuasive.